[Civil No. 1533.   Filed May 19, 1917.]

[164 Pac. 1182.]

PETER ROUSS, Trading as CHARLES BROADWAY ROUSS, Appellant, v. F. T. LA PRADE, Appellee.

PARTNERSHIP—EVIDENCE OF RELATION—SUFFICIENCY.—Evidence *held* wholly insufficient to show a partnership, as all acts which would indicate the same were without the authority or assent of one of the alleged partners, and were never ratified by him.

[As to what agreements establish the existence of a partnership, see note in 43 Am. St. Rep. 229.]

APPEAL from a judgment of the Superior Court of the county of Navajo. John A. Ellis, Judge. Affirmed.

Mr. Thorwald Larson and Messrs. Norris & Mitchell, for Appellant.

Mr. X. N. Steeves, for Appellee.

FRANKLIN, C. J.—Peter W. Rouss, trading as Charles Broadway Rouss, in the city of New York, brought this action against Warren G. Hunter, Lenna L. Hunter, and F. T. La Prade as a copartnership doing business under the firm name of the "Racket Store" in Winslow, Arizona. The plaintiff sought to recover $1,490.42 on an open account for merchandise alleged to have been sold and delivered to said the "Racket Store." At the close of the evidence the jury was instructed to return a verdict in favor of the defendant La Prade and against the plaintiff. This was done, and, following the verdict, judgment was entered. A motion for a new trial was denied, and from the judgment and order this appeal is prosecuted.

In the argument and briefs there is much said *pro* and *con* about a certain stipulation which appellant contends limited the issues to be tried to the sole question of the copartnership relation of La Prade with the other defendants. In the view we take of the case it is unnecessary to consider the effect of the stipulation, it being sufficient to decide whether there is any substantial evidence in the record, about which the minds of reasonable men might differ, that the defendant La Prade was a member of the alleged copartnership. The defendant Hunter, when he first located in Winslow, commenced doing business in a small way, buying and selling dry-goods and notions. He was assisted in this business by his wife, the defendant Lenna L. Hunter. At the beginning he occupied some property owned by La Prade as a subtenant. Afterward, when the business had grown a little, Hunter rented another piece of property from La Prade, in which he located the "Racket Store," he and his wife occupying some living-rooms adjoining. After conducting this business a few years the Hunters left Winslow rather unexpectedly, leaving behind what remained of the stock of goods and this alleged indebtedness against the business as a remembrance. There are little bits of testimony sprinkled over the record, and which it is needless to mention in detail, all compatible, however, with the relation of landlord and tenant, but none of these having any force as evidence of any copartnership interest on the part of La Prade in the "Racket Store." Such, for instance, as on occasions when Hunter was hard pressed for money, La Prade would help him out in the way of small loans. La Prade also got some items of

merchandise from the store, such as a pair of pants, a few shirts, and the like.   One of plaintiff's exhibits is a note and contract.   The note is a joint and several one in favor of Rouss.   It is dated April 2, 1912, and purports to be signed by the Hunters and La Prade.   Both note and contract expressly recite that the note is given as collateral security for the payment of an open account limited to a credit extended, or about to be extended, to W. G. Hunter, in merchandise to the amount of $300.   La Prade emphatically asserts that the signature to the alleged "note and contract" purporting to be his signature is a forgery.   La Prade unequivocally denies that he ever signed any such paper at any time or at all. There is no satisfactory evidence that he did sign it.   The officers of the bank who were called to identify the signature expressed doubts about it being genuine.   On April 5, 1912, Hunter went to the Navajo-Apache Bank & Trust Company in Winslow and asked the president of the bank to draft a form of articles of copartnership between him and La Prade. These articles were drafted as directed by Hunter and according to his dictation.   Hunter was a customer of the bank, as was also La Prade, the latter being a comparatively wealthy man and one of the substantial citizens of Winslow, with credit unimpaired.   Mr. W. H. Burbage, who was the president of the bank at the time, is a lawyer by profession. When this form of a copartnership agreement had been drafted, Hunter asked the president to give him a letter to Rouss, recommending him for credit in the purchase of merchandise.   At his request, and on the faith of representations made by Hunter, the president of the bank gave him the letter, a copy of which is as follows:

"[Letter-head of Navajo-Apache Bank & Trust Co.]
"April 5th, 1912.
"Chas. Broadway Rouss, New York.

"Sir: Mr. W. G. Hunter of this town is about to open a small store for the sale of sundry Ladies articles of wearing apparel, laces, embroideries, etc., he informs me that he is intending to make his purchases from your establishment, and requested me to write you as to his standing in this community.

"Mr. Hunter since comeing here to this town has at all times led a most exemplary life, he is industrious, and sober, and has the respect of every body here his partner Mr. F. T.

La Prade is one of our very wealthiest citizens, worth at least $75,000. this is an experiment to start with, and Mr. La Prade does not care to be known in the business, so that according to the articles of agreement which I drew up this morning between Mr. Hunter and Mr. La Prade the later is to be the silent partner, so that the credit of the new firm should be the very highest.

"Yours respectfully,

"W. H. BURBAGE, Pres."

The president of the bank had no authority whatever to act in these matters for La Prade. What was done was done solely at the instance of Hunter. La Prade did not know of these matters until several weeks afterward. When he did find out what had been done, he became very angry, scolding the president of the bank for drafting. the partnership papers. La Prade at all times denied that he was a partner of Hunter. It appears that when La Prade learned of the copartnership papers he came into the bank "roaring and was mad" about it. It does not appear that La Prade had any knowledge of the letter. Mr. Burbage, the president of the bank, testifying, said:

"He [La Prade] says: 'By what authority did you draw up copartnership papers for Hunter and me?' He was mad about it. Q. What did you tell him? A. I told him I drew it up because I got paid for it. That's my business to draw up papers for anybody. Q. Is it your business to send out letters like that? A. I did that at the request of Mr. Hunter. I took Mr. Hunter's word for it; that he and La Prade were going to form a partnership. It was very simple on my part. I had no reason to doubt Hunter. Q. Why did you say that he was the partner of Hunter? A. Because he told me he and La Prade were going into partnership, and asked me to make up the papers in accordance, and on the strength of that asked me to write that letter to help his credit, which' I also did."

Conceding for the purpose of argument that La Prade did sign the "note and contract," we fail to see any evidence of a copartnership here. On the other hand, it tends to disprove any such relation. La Prade was a wealthy man, his credit excellent. If Rouss exacted it, it must have been because he would not extend credit to Hunter. If Hunter wanted it, it was for the purpose of getting credit to the ex-

tent of $300 in virtue of La Prade's financial standing. From the very constitution of a partnership, a presumption arises that each partner is an authorized agent of the rest in contracts relating to the subject matter of the partnership. Then why this alleged note and contract? The partnership, if it existed at all, was merchandising, and if appellant sold and delivered merchandise to it within the scope of its business at the instance of any one of them, all would become liable. Of itself the "note and contract" wholly repels any notice of the existence of a partnership. Neither does the draft of the articles of copartnership and the letter of the bank president, recommending Hunter to appellant for credit, have any probative force to prove such relation. The difficulty is that no act is traced to La Prade upon the issue of partnership. The things done, the statements made, all were without his knowledge and consent. Nothing was done in his presence which has even a remote tendency to prove the issue. What was done in his absence was unauthorized, was never assented to, or adopted or ratified by him. On the contrary, when the occasion presented he promptly and resolutely repudiated the whole thing. It may be, as appellant asserts, that the credit was extended to the "Racket Store" on the faith of the letter of the bank president recommending Hunter. But however this may be, it is perfectly clear that the indebtedness thereby incurred may not be recovered from one who played no part in the matter at all. The only intimation one gets from a careful reading of the record is that Hunter sought to give the impression by indirection that a partnership existed between him and La Prade. In this he seems to have been somewhat successful, but, even so, it falls far short of proving the issue.

The judgment of the superior court is right, and it is in all things affirmed.

CUNNINGHAM and ROSS, JJ., concur.